USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   5/7/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BEACON ASSOCIATES LLC I, *et al.*,           :
                                              :
                        Plaintiffs,           :          **OPINION AND ORDER**
                                              :
        -v-                                    :          No. 14-CV-2294 (JLC)
                                              :
                                              :
BEACON ASSOCIATES MANAGEMENT              :
CORP*., et al.*,                              :
                                              :
                        Defendants.           :
-------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiffs Beacon Associates LLC I, Beacon Associates LLC II, Andover

Associates LP, Andover Associates LLC I, and Andover Associates (QP) LLC

commenced this declaratory judgment action to determine the proper valuation

method for disbursement of certain sums of money.  Plaintiffs are investment funds

that heavily invested in the now-infamous Bernard L. Madoff's investment company

and, since discovery of the fraud perpetrated by Madoff, have been recovering tens

of millions of dollars as a result of Madoff-related lawsuits and settlements.  Income

Plus Investment Fund and David Fastenberg, Trustee, Long Island Vitreo – Retinal

Consultants 401K FBO David Fastenberg are investors who advocated for opposing

valuation methods for disbursement of the Madoff-related recoveries and are among

the named defendants in this action.  The Court entered judgment on October 31,

2014.  Both Income Plus and Fastenberg now jointly move for attorneys' fees under

the common fund doctrine, arguing that their work in this action resulted in higher

distributions for—and therefore benefitted—the vast majority of Beacon investors such that their attorneys' fees should be reimbursed.  For the reasons set forth below, the motion is denied.

## I.  BACKGROUND

Plaintiffs Beacon Associates LLC I, Beacon Associates LLC II (collectively, "Beacon" or the "Beacon Funds"), Andover Associates LP, Andover Associates LLC I, and Andover Associates (QP) LLC (collectively, "Andover" or the "Andover Funds" and together with Beacon, the "Funds") are New York limited liability companies made up of numerous entities and individuals who hold membership interests in them.  Complaint dated April 2, 2014 ("Compl."), Dkt. No. 2, ¶¶ 14–15.  Defendant Beacon Associates Management Corp. is the managing member of the Beacon Funds.  *Id.* ¶ 2.  Defendant Andover Associates Management Corp. is the managing member of the Andover Funds.  *Id.* ¶ 3.  Defendants Income Plus Investment Fund ("Income Plus") and David Fastenberg, Trustee, Long Island Vitreo – Retinal Consultants 401K FBO David Fastenberg ("Fastenberg" and together with Income Plus, "Defendants") are investors in the Beacon Funds.  *Id.* ¶ 4.[1]

## A.  Earlier Litigation Concerning Distribution of Non-Madoff Assets

Since the Funds' inception, Beacon invested approximately 70% of its assets, and Andover 30% of its assets, in Bernard L. Madoff Investment Securities LLC ("BLMIS"), which, between 1995 and December 2008, reported substantial gains on

---

[1] To be clear, the designation "Defendants" as used in this Opinion and Order does not include Beacon Management Corp. and Andover Management Corp., neither of whom are parties to the instant motion.

the Beacon and Andover investments.  *Id.* ¶¶ 23–25.  The Funds, in turn, allocated those reported gains to their members in proportion to each member's interest in the Funds.  *Id.* ¶ 25.  In December 2008, it was discovered that Madoff had been operating a massive Ponzi scheme and that virtually all of the money invested with BLMIS was stolen.  *Id.* ¶ 26.  As a result of the Madoff-related losses, the Funds sought to liquidate, writing down all of their Madoff investment value to zero and seeking to distribute the remaining non-Madoff invested funds (the "Non-Madoff Assets") to the Funds' investors (subject only to a reserve held for future expenses of the Funds).  *Id.* ¶¶ 6, 30–31.  However, in the effort to effectuate that distribution of assets, a dispute arose among investors as to the proper method for distributing the Non-Madoff Assets to individual Fund members.  *Id.* ¶¶ 6, 34.  Several alternatives existed, but each would result in material differences in the valuations of members' capital accounts.  *Id.* ¶ 7.

The dispute was submitted to the Court for resolution on August 5, 2009, and on July 27, 2010, Magistrate Judge Andrew J. Peck, to whom this case was previously assigned on consent until his retirement in 2018, ordered that the Non-Madoff Assets be distributed pursuant to the Valuation Method prescribed by Beacon's governing documents.  *Beacon Assocs. Mgmt. Corp. v. Beacon Assocs. LLC I*, 725 F. Supp. 2d 451, 460–63 (S.D.N.Y. 2010).  The Valuation Method was described by the Court as follows:

> The first such method, referred to as the "Valuation Method," treats the Madoff losses as though they occurred due to "market fluctuations," that is, the Madoff-related losses are reported as having occurred in December 2008

> (the date of discovery) and, pursuant to Beacon's
> Operating Agreement, allocated to each member on a pro-
> rata basis. Thus, if a member's "capital balance
> represented 1% of the fund as of December 1, 2008 . . .,
> that [member] would be allocated 1% of the losses
> attributable to Madoff."

*Id.* at 455; *see also* Compl. ¶ 41.

In reaching its decision, the Court considered alternatives to the Valuation Method, including the Restatement Method, which would have treated the Funds' losses as having occurred in the same month that each of their investments in BLMIS were made. *Beacon Assocs. Mgmt.*, 725 F. Supp. 2d at 455; *see also* Compl. ¶ 36. One other methodology not directly considered by the Court in that proceeding but relevant here is the Net Equity Method, described as follows:

> The Net Equity formula (sometimes called "cash in/cash
> out") determines each investor's interest in the Funds by
> calculating how much each investor contributed to Beacon
> or Andover and subtracting from that the amount
> withdrawn by the investor (i.e., cash in / cash out).  To
> further amplify, an investor's "Net Equity," for the
> purpose of the distributions at issue here, has been
> calculated as the amount of the investor's investment of
> principal less any withdrawals or distributions received
> from the Funds, including the distributions made by the
> Funds in 2010.  Any distribution to be made under the
> Net Equity Method would be calculated by taking the
> member's Net Equity percentage (calculated by
> comparing the net equity total investment to the total net
> equity investment of all Beacon investors) and
> multiplying it by the total amount of funds available for
> that distribution to Beacon investors.

Compl. ¶ 40.

**B.   The Instant Action Concerning Distribution of Madoff-Related Assets**

Since the Court's 2010 ruling pertaining to the Non-Madoff Assets, the Funds have recovered additional monies that required distribution to members, including those from the bankruptcy trustee appointed after the discovery of the Madoff fraud (the "Madoff Trustee") and from certain other litigation relating thereto.  *Id.* ¶¶ 8–10, 37–38.  As a result, a new dispute arose among investors as to which of the two methods—the Valuation Method or the Net Equity Method—should be utilized to distribute these newly-received assets.  *Id.* ¶ 39.

As such, the Funds commenced this action for a declaratory judgment on April 2, 2014, naming as additional defendants the two lead investors who had articulated opposing positions on the proper distribution method for Madoff-related recoveries—Income Plus and Fastenberg.  *Id.* ¶ 4.  Income Plus believed that the Funds should distribute the recovered sums pursuant to the governing documents, which mandated the use of the Valuation Method, *id.* ¶ 42, while a group of 160 investors in the Funds, including Fastenberg, considered the Net Equity Method more appropriate because the sums to be distributed were related to the losses suffered as a result of the Madoff fraud, *id.* ¶ 43.  Other investors weighed in and advocated for one method or the other.  *See* Summary Report of Investor Positions by Fund Counsel dated October 3, 2014, Dkt. No. 39.  The Funds themselves did not take a position on which method of distribution was appropriate.  Declaration of Arthur G. Jakoby filed November 20, 2019 ("Jakoby Decl."), Dkt. No. 129, ¶ 11.

After briefing, a fairness hearing was held before Judge Peck on October 7, 2014 during which counsel for the Funds, Fastenberg, Income Plus, and other interested investors addressed the Court.  Minute Entry dated October 7, 2014.  At the close of the hearing, Judge Peck crafted a combination of the two proposed methods, ordering all money received by the Funds from the Madoff Trustee, and as otherwise identified in the Complaint, be distributed according to the Net Equity Method until all investors were made whole (*i.e.*, when investors received back all of their principal invested in the Funds), at which point distributions would follow the Valuation Method.  Joint Letter dated October 14, 2014, Dkt. No. 41; Fairness Hearing Transcript, Dkt. No. 43.  The Court entered the Final Distribution Order and Judgment ("Final Distribution Order") on October 31, 2014, Dkt. No. 51, pursuant to which the Funds distributed more than $49 million to their investors.  Joint Letter dated January 23, 2015 ("Holdback Issue Letter"), Dkt. No. 53.

## C.  Post-Judgment Dispute Concerning Net Equity Computations

At the time of the initial distribution of funds, another dispute arose concerning the computation of one Beacon investor's net equity for purposes of its distribution under the Final Distribution Order (the "Holdback Issue").  *Id.*; *see also* Defendant Income Plus's Memorandum of Law in Support of Motion for Attorneys' Fees and Expenses ("Def. Mem."), Dkt. No. 123, at 6–9; Beacon's Memorandum of Law in Opposition to Motion for Attorneys' Fees and Cost ("Pl. Opp."), Dkt. No. 128, at 9.  According to Beacon, the account of its investor AIJED International LLC ("AIJED II") had been opened with a significant deposit of funds—$6.9 million—

transferred from an existing Beacon account held by AIJED Associates LLC ("AIJED I").  Pl. Opp. at 9–10; *see also* Jakoby Decl. ¶ 16.  Some of the transferred funds contained "fictitious Madoff profits," and because Beacon had no way to determine how much of the $6.9 million represented such profits, AIJED II's net equity calculation was necessarily inflated.  Jakoby Decl. ¶¶ 16–17.  This issue affected not only AIJED II but a total of 18 different Beacon accounts (the "Holdback Investors").  *Id.* ¶ 20; *see also* Holdback Issue Letter.  No Andover accounts were affected by this issue.  *Id.*

In order to effectuate a planned January 2015 distribution without delay, Beacon calculated each investor's "potential" distribution amount by giving the 18 affected investors full credit for the fictitious Madoff profits transferred to their new accounts.  Jakoby Decl. ¶ 21.  However, in calculating the "actual" amount to be distributed to the affected investors, to the extent that Beacon knew the precise amount of fictitious Madoff profits transferred to new accounts, it deducted such profits from that investor's net equity calculation and held back the difference between the "potential" distribution amount and the "actual" distribution amount in escrow (the "Holdback Amount").  *Id.*  The Holdback Amount—a sum of $4,297,559—was therefore not distributed with the January 2015 distribution.  *Id.* ¶ 23.  The bulk of the Holdback Amount consisted of AIJED II's $3,538,229 holdback.  *Id.*

On January 14, 2015, counsel for Beacon, Income Plus, Fastenberg, and AIJED II raised with the Court the issue concerning the computation of AIJED II's

net equity under the Final Distribution Order.  Minute Entry dated January 16,

2015; Conference Transcript, Dkt. No. 61.  In the course of briefing the issue, AIJED

II contended that it was a separate legal entity from AIJED I and thus, for net

equity purposes, its initial investment must be treated as a "new" cash contribution.

AIJED II's Memorandum of Law in Support of Its Application for Release of Funds

Due, Dkt. No. 76, at 1–4.  Conversely, Defendants argued that AIJED II's net equity

should reflect the fact that some of the money transferred in consisted of fictitious

Madoff profits and therefore funds transferred from one Beacon account to another

related account should not be treated as "new money" for the purposes of calculating

net equity under the Final Distribution Order.  Income Plus's Memorandum of Law

Relating to Calculation of Net Equity for Certain Investors, Dkt. No. 69, 2–6;

Fastenberg's Memorandum of Law in Support of Request for Mandatory Injunction

and Declaratory Judgment, Dkt. No. 72, at 2–4.  Beacon remained neutral as to the

treatment of fictitious Madoff profits being transferred from one Beacon account to

another.  Jakoby Decl. ¶ 19.

On April 8, 2015, the Court ordered that "in equity and fairness, each related

account should be treated as a single entity for purposes of determining Net

Equity."  Order dated April 8, 2015, Dkt. No. 91, at 1.  The Court rejected AIJED

II's argument that its accounts should not be combined for net equity purposes

because investors in the two AIJED funds were different, finding instead that

"Investor A and Investor B, and not their investors, were members of Beacon."  *Id.*

at 2.  The Court further held that the other "Holdback Investors" identified by

Beacon should be treated as single entities for purposes of the net equity calculations.  *Id.* at 3.

AIJED II was the only Holdback Investor that filed an appeal.  Notice of Appeal dated April 14, 2015, Dkt. No. 92.  Consequently, it sought and received a stay of distribution of the amount attributable to the holdback of its funds.  Motion for Stay of Enforcement and Preliminary Injunction Pending Appeal, Dkt. No. 97; Minute Entry dated May 1, 2015.  On July 1, 2015, however, AIJED II advised the Court that it was withdrawing its appeal.  AIJED Letter dated July 1, 2015, Dkt. No. 116.  Therefore, on July 13, 2015, the Court notified the parties that "Beacon [was] free to distribute the Holdback Funds."  Memo Endorsement dated July 13, 2015, Dkt. No. 117.

## D. Defendants' Motion for Reimbursement of Attorneys' Fees and Costs Under the Common Fund Doctrine

On June 13, 2019, Income Plus raised by letter-motion the issue of reimbursement of legal fees and costs for the first time with the Court.  Letter Motion for Conference dated June 13, 2019, Dkt. No. 118.[2]  Judge Peck having retired, the case was reassigned to me on June 14, 2019.  Minute Entry dated June 14, 2019.  The Court held a telephonic conference on June 20, 2019, setting a schedule for discovery and briefing on the issue.  Order dated June 20, 2019, Dkt. No. 121.

---

[2] The parties appear to agree that some discussions about a fee application occurred among themselves prior to Income Plus reaching out to the Court.  Pl. Opp. at 1 n. 1; Defendant Income Plus's Reply Memorandum of Law in Further Support of Motion for Attorneys' Fees and Expenses, Dkt. No. 132, at 5.

On September 20, 2019, Income Plus moved for attorneys' fees and expenses under the common fund doctrine.  Income Plus Motion for Award of Attorneys' Fees and Expenses, Dkt. No. 122; Def. Mem.; Declaration of Brian E. Whiteley dated September 20, 2019 ("Whiteley Decl."), Dkt. No. 124; Declaration of John P. Jeanneret dated September 20, 2019, Dkt. No. 125.  Fastenberg joined the motion by declaration.  Declaration of Max Folkenflik dated September 20, 2019 ("Folkenflik Decl."), Dkt. No. 126, ¶ 2; *see also* Supplemental Declaration of Max Folkenflik dated November 1, 2019 ("Folkenflik Supp. Decl."), Dkt. No. 127. Defendants seek reimbursement from Beacon of $1.4 million  in attorneys' fees and expenses—or $700,000 for each of Income Plus and Fastenberg—representing 25% of an alleged $5.6 million common fund Defendants argue that they helped create in early 2015.  Def. Mem. at 10–11; Folkenflik Supp. Decl. ¶ 2.  According to Defendants, based on the fact that AIJED II—before the recalculation of its net equity—would have received approximately 6.6% of the $84,904,984 Beacon has distributed to date, or $5,603,729, that $5.6 million was instead available for distribution to the balance of the investors in Beacon.  Def. Mem. at 9–11.  The actual fees and expenses incurred by Income Plus during the time period of August 2013 through July 2014 totaled more than $175,000.  Whiteley Decl. ¶ 17.  The actual fees incurred by Fastenberg through September 2016 amounted to $226,558. Folkenflik Decl. ¶ 12.[3]

---

[3] Fastenberg's work in this matter was funded by his investment manager Family Management Corporation.  Folkenflik Decl. ¶ 1.

On November 20, 2019, Beacon filed opposition papers, arguing, in short, that Defendants "did not create a common fund benefit, and even if they did, the time to seek attorney's fees would have been before the Holdback Funds were distributed, not four years later." Pl. Opp. at 13; *see also* Jakoby Decl., Dkt. No. 129; Declaration of Debbie Potash-Turner filed November 20, 2019 ("Potash-Turner Decl."), Dkt. No. 130. Beacon notes objections to Defendants' fee application from at least two investors, including the David Nicholson Living Trust. Jakoby Decl. ¶ 33. In addition, Beacon investor Howard Siegel submitted through Beacon's counsel a declaration of his own opposing the application. Beacon Letter dated November 20, 2019, Dkt. No. 131; Declaration of Howard Siegel dated November 20, 2019 ("Siegel Decl."), Dkt. No. 131-1.

On December 10, 2019, Defendants filed reply papers, revising their calculation of the common fund to $6.4 million, which now includes the other Holdback Investors' percentage interest of distributions to date, plus the addition of the $4.3 million Holdback Amount. Defendant Income Plus's Reply Memorandum of Law in Further Support of Motion for Attorneys' Fees and Expenses ("Def. Reply"), Dkt. No. 132, at 3–4; Supplemental Declaration of Brian E. Whiteley dated December 10, 2019, Dkt. No. 132-1; Supplemental Declaration of Max Folkenflik dated December 9, 2019, Dkt. No. 132-2; Supplemental Declaration of John Jeanneret dated December 10, 2019, Dkt. 132-3.

## II.  DISCUSSION

### A.  Defendants' Fee Application Is Untimely

Federal Rule of Civil Procedure Rule 54(d)(2) provides that "[u]nless a statute or a court order provides otherwise, [a] motion [for attorneys' fees] must . . . be filed no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54(d)(2).  "While many jurisdictions have local rules that preempt Rule 54 by allowing fee motions thirty or more days after entry of judgment, the Southern District of New York does not have such a rule." *Freudenberg v. E*Trade Financial Corp.*, No. 07-CV-8538 (JPO), 2013 WL 12330586, at *1 (S.D.N.Y. April 5, 2013) (quoting *Marchisotto v. City of New York*, No. 05-CV-2699 (RLE), 2009 WL 2229695, at *3 (S.D.N.Y. July 27, 2009)).  Here, the Final Distribution Order and Judgment was entered on October 31, 2014.  Defendants did not file their application until September 20, 2019, almost five years after the entry of judgment.  While it is true that an appeal was taken in this case, "[a] notice of appeal does not extend the time for filing a fee claim based on the initial judgment . . . ." Fed. R. Civ. P. 54, 1993 Advisory Committee's Notes.  Even if there was a tolling effect between the issuance of the October 31, 2014 Final Distribution Order and Judgment and the date Judge Peck permitted Beacon to distribute the Holdback Funds on July 13, 2015 after AIJED II withdrew its appeal, Defendants waited nearly four years, until June 13, 2019, to raise the issue of seeking reimbursement of their fees.

In response to Beacon highlighting this delay as a basis for the denial of the motion, Defendants argue that "Beacon's reliance on [Rule 54(d)(2)] is misplaced

because the scope of the common fund could not be ascertained within 14 days of judgment and because the Court retained jurisdiction with respect to the matter." Def. Reply at 5.  Even if the alleged common fund could not have been ascertained within 14 days of judgment, it certainly did not take four years for the alleged common fund as calculated by Defendants to come to fruition.  Indeed, because Defendants' calculation of the common fund consists of applying AIJED II's original percentage interest in Beacon to all distributions to date, Defendants could have at least computed the initial amount of the common fund after Judge Peck resolved the Holdback Issue, and disbursements under the Final Distribution Order commenced thereafter.  It does not help Defendants' claim for fees that their valuation of the common fund, as further discussed below, is essentially a moving target.  The scope of the common fund cannot be ascertained even now, as Defendants themselves acknowledge, given "that the common fund at issue is not a static pool of money that Beacon has already distributed but rather an ongoing monetary benefit to non-AIJED Beacon investors."  *Id.* at 1.

In any event, Defendants could have invoked Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure, which allows the court "for good cause" to extend the Rule 54(d)(2) deadline "on motion made after the time has expired if the party failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1)(B).  However, Defendants never sought an extension under Rule 6, much less offered any justification for "excusable neglect."  This failure alone provides an adequate ground for denial of the motion.

Defendants also contend that the Court retained jurisdiction over all fee-related issues through its Final Distribution Order, which Defendants quote in part:

> **IT IS FURTHER ORDERED THAT** this Court shall retain jurisdiction over any issues that arise with respect to the distribution of funds pursuant to this Order, the final liquidation of the Funds and any potential adjustments made to any individual investor with such investor having the right to challenge any such adjustment after being advised of the proposed adjustment by the Funds or the Fund seeking a further Order from the Court's [sic] with respect to any such proposed adjustment upon notice to the investor[.]

Def. Reply at 5–6 (quoting Final Distribution Order at 7–8).

While by the terms of the Order the Court retained jurisdiction over "any issues that arise with respect to the distribution of funds," nowhere in the quoted portion or anywhere else in the Order does it provide that the Court retained jurisdiction over issues related to fees.  Even if it did, the mere retention of such jurisdiction does not obviate the need to file motions for fees and costs in accordance with the deadlines contained in the Federal Rules of Civil Procedure, otherwise counsel could be making fee applications in perpetuity.  *See*, *e.g.*, *Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 227 (2d Cir. 2004) (Rule 54's "order of the court" exception to 14-day deadline does not "confer[] on district courts untrammeled discretion to extend the time to file a fee motion" without finding of "excusable neglect"); *see also In re Veritas Software Secs. Litig.*, 496 F.3d 962, 973 (9th Cir. 2007) (district court's final judgment reserving jurisdiction over fee

applications did not modify Rule 54's 14-day deadline).[4]  Finally, there is nothing in the record provided to suggest that the parties did not have to bear their own costs and fees, as would normally be the case unless some fee-shifting was provided for by law or by agreement.  For all these reasons, the application is denied as untimely.[5]

## B.  Defendants Have Not Established That They Are Entitled to Fees Under the Common Fund Doctrine

Even if I found the application to be timely and cognizable, I am not persuaded by Defendants' argument that they are entitled to attorneys' fees and costs under the common fund doctrine.

"Under the common fund doctrine, a party that secured a fund for the benefit of others, in addition to himself, may recover his costs, including his attorney's fees, from the fund itself or directly from the other parties enjoying the benefit."  *In re*

---

[4] The Court does not see how any internal discussions the parties may have had about fees bear on these deadlines, and Defendants cite no authority to suggest that merely discussing a possible claim for fees somehow preserves the claim.  Indeed, "[t]he fact that the parties were 'well aware' that [Defendants] intended to file a fees motion at some indeterminate date in the future does not excuse noncompliance with the applicable procedural rules."  *Bender v. Freed*, 436 F.3d 747, 750 (7th Cir. 2006).

[5] Even if Defendants' claim for attorneys' fees was considered to be ongoing, it should be disallowed on laches grounds as well.  The doctrine of laches generally bars claims in which the claimant engaged in unreasonable delay and the counterclaimant was prejudiced thereby.  *See*, *e.g.*, *King v. Innovation Books, a Div. of Innovative Corp.*, 976 F.2d 824, 832 (2d Cir. 1992) (citation omitted).  Here, Defendants' delay in applying for attorneys' fees—whether the delay is five years from the issuance of the Final Distribution Order or four years from the Court's notice allowing Beacon to distribute the Holdback Funds—is unreasonable.  Furthermore, Beacon is prejudiced by the delay as it will have to either claw back funds from investors or draw from its operating reserves if fees were awarded.  Pl. Opp. at 4.

*Holocaust Victim Assets Litig.*, 424 F.3d 150, 157 (2d Cir. 2005) (citing *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996)) (internal quotations omitted).[6]  "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (internal citations omitted).

Both the Supreme Court and the Second Circuit have long recognized that attorneys whose efforts create a "common fund" are entitled to a reasonable fee from that fund.  *See Boeing*, 444 U.S. at 478; *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  The Second Circuit uses "the term 'common fund doctrine' somewhat broadly so as to incorporate the 'common benefit' doctrine—the rule by which plaintiffs may seek recovery of costs, even where no 'fund' has been recovered, as long as it is possible to spread the burden of those costs proportionately among members of the class." *Savoie*, 84 F.3d at 56 n.3.

For the common fund doctrine to apply, "the applicant's efforts must confer a 'substantial benefit on the members of an ascertainable class.'" *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393–94 (1970)).  "[A] substantial benefit must be something more than technical in its consequence and be one that accomplishes a result which

---

[6] As such, any reference to "attorneys' fees" and entitlement thereto is a reference to entitlement to costs as well.

. . . affect[s] the enjoyment or protection of an essential right to the [party's] interest." *Mills*, 396 U.S. at 396 (citation omitted).

Additionally, it is within the court's equitable discretion to award fees and costs under the common benefit doctrine. *See, e.g.*, *Victor v. Argent Classic Convertible Aribtrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010) (no abuse of discretion in awarding class action lead counsel attorneys' fees pursuant to common fund doctrine); *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010) (award of attorney's fees pursuant to common fund doctrine examined under abuse of discretion standard).

Defendants argue that Beacon should reimburse their attorneys' fees because their efforts in challenging AIJED II's net equity computation created a $5.6 million common fund that benefitted a vast majority of Beacon investors and that fund would not have been created but for Defendants' efforts. Def. Mem. at 1, 5, 9–11. Beacon counters that the common fund doctrine does not apply in this case for a number of reasons: first, no common fund or other common benefit was created, Pl. Opp. at 13–17; second, this was not a class action such that there was a risk of unjust enrichment, *id.* at 17–20; third, counsel for Defendants did not proceed on a contingency basis and have already been paid, *id.* at 20–22; and fourth, an award under these circumstances would be inequitable as Defendants sought to advance their own interests, *id.* at 23–24.

As a threshold matter, it is of no moment that this suit is outside the class action context. *See* Herbert B. Newberg, *Newberg on Class Actions*, § 15:53 (5th ed.

2011) (common fund doctrine not limited to class actions) (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166 (1939)).  Or that counsel have already been paid and Defendants are seeking reimbursement.  *See*, *e.g.*, *In re Magazine Antitrust Litig.*, No. 00-CV-4889 (RCC), 2004 WL 253325, at *3 (S.D.N.Y. Feb. 10, 2004) ("[A] party recovering a fund for the benefit of others may recover his costs, including attorneys' fees, from the fund itself or directly from the other parties enjoying the benefit.").  Or even that Defendants acted out of self-interest.  *See*, *e.g.*, *In re Vitamins Antitrust Litig.*, No. 99-MC-197 (TFH), 2001 WL 34312839, at *8 (D.D.C. July 16, 2001) ("[T]he Supreme Court has approved the awarding of fees in instances where a plaintiff has sued and created a benefit for a class, even though the plaintiff was not suing on behalf of the persons who subsequently benefitted from the *stare decisis* effect of the litigation.") (citing *Fleishmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967)).

What is problematic, however, is that Defendants have failed to establish that they created a common benefit to Beacon as a whole.  "[A] material benefit to the class is a *sine qua non* for an attorney's entitlement to an award of fees from the common fund." *Holocaust Victim Assets Litig.*, 424 F.3d at 157; *see also In re Joint Eastern and Southern District Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992) (denying fees where firm failed to identify "any concrete benefit that its efforts conferred on the class").  According to Defendants, "every time the Madoff Trustee makes a distribution to the Beacon Fund, the vast majority of Beacon's investors benefit from the work done by [Defendants] because a larger pool of money is

available to them for distribution."  Def. Reply at 1.  In particular, Defendants contend that "Beacon had distributed over $5.6 million more to a majority of investors than originally projected and will continue to make distributions to the investors that exceed what they would have received in the absence of the work performed by" Defendants.  Def. Mem. at 6.

Notwithstanding Defendants' view, it is difficult to discern how their objections to AIJED II's original net equity calculation created a $5.6 million common fund "that would otherwise not have been paid" to Beacon.  Def. Mem at 1. The alleged $5.6 million common fund is AIJED II's percentage interest of all distributions Beacon has made to date, that is, a portion of the *pre-existing* Madoff-related recoveries that were in place for the benefit of all.  Thus, the alleged common fund did not come into existence through the efforts of Defendants' counsel.

Indeed, as Beacon observes, the alleged $5.6 million common fund "was money that would have been distributed to [the Holdback Investors] but was instead put back into the pool of all funds to be distributed and allocated to the remaining investors who had not yet . . . broke[] even on its cash in/cash out position."  Pl. Opp. at 16.  In other words, Defendants did not create a separate pool of funds for the benefit of all Beacon investors.  Nor did Defendants' efforts increase or otherwise preserve an amount of the recovery that was at risk of being reduced. Rather, their involvement led merely to a reshuffling of disbursements that allowed some investors to receive higher distributions while simultaneously reducing the distributions made to others.  Therefore, Defendants have not met the threshold

showing that their work in these proceedings resulted in substantial enhancement in the Madoff recoveries.

Arguably, the efforts undertaken by Defendants in challenging the net equity computation issue were of some value to Beacon by obtaining judicial clarification for computing net equity under the Final Distribution Order and providing such guidance as it will for the future.[7]  But that was the entire point of the Funds bringing this declaratory action in the first place.  Defendants' critique of AIJED II's net equity computation resulted in the reallocation of funds to different investors but had no impact on the amount of relief available to Beacon as a whole. Notably, the Second Circuit has refused to approve a district court's award of attorneys' fees under the common fund doctrine where it found the benefit to be "purely cosmetic and ephemeral."  *Kaplan v. Rand*, 192 F.3d 60, 72 (2d Cir. 1999) (internal citations and quotation marks omitted).  Nothing Defendants did allowed Beacon to recover more (or otherwise be in an improved position) than it would have been in the absence of their efforts.

---

[7] The parties dispute who first identified the Holdback Issue.  While Defendants urge that they were the ones who identified the issue "during the initial briefing process,"  Def. Mem. at 6, Beacon maintains that the issue was identified by the Funds' CFO Debbie Potash-Turner.  Pl. Opp. at 3.  Investor Siegel also credits Potash-Turner for first discovering the issue.  Siegel Decl. ¶ 8 ("[Potash-Turner] uncovered the issues surrounding certain accounts that had transfers between related accounts. . . . .  Mr. Whitel[e]y's claim that they uncovered the issues surrounding these accounts is neither correct, nor is their claim that they needed to spend lots of time reviewing schedules.  They merely had to ask the CFO, and she was available to shortcut all their problems.").

Moreover, it is not even clear that Defendants' calculation of the alleged common fund is sound.  For example, Defendants do not explain the basis for applying AIJED II's percentage interest to *all* distributions *to date*.  Judge Peck had ordered that once all investors were made whole under the Net Equity Method, the funds would then be disbursed under the Valuation Method.  Beacon reports that, as of March 2016, all Beacon investors reached the break-even position.  Pl. Opp. at 16; Potash-Turner Decl. ¶ 3.  Even if there was some fund-wide benefit flowing from Defendants' involvement with AIJED II's net equity computation, the Court sees no basis for Defendants to claim continuing credit for AIJED II's portion of all distributions to date—which appears wholly arbitrary (the longer Defendants waited to make this fee application, the greater the common fund would be).

In any event, the precise value of the common fund is immaterial because, as discussed above, Defendants did not contribute to its creation or preservation. Viewed most generously, Defendants' efforts were helpful in clarifying an accounting issue.  This initiative, however, did not confer a material benefit to Beacon.  Defendants cannot be credited for the sums of money recovered from Madoff-related litigation.  Otherwise, "it seems only fair," as Investor Siegel points out, that he and anyone who participated in this and related litigation "be allowed to bill for [their] efforts over the last ten years that have benefitted all Beacon investors . . . ."  Siegel Decl. ¶ 10.

The rationale for creating the common fund exception is to spread the cost of litigation among those who benefit from an attorney's work.  "The corollary is that

the entire class should not be responsible for compensating attorneys for efforts that benefitted only those attorneys or their clients." *In re Citigroup Inc. Securities Litig.*, No. 09-MD-2070 (SHS), 2013 WL 12328803, at *1 (S.D.N.Y. Aug. 27, 2013) (citing *Boeing*, 444 U.S. at 478). Defendants concede that not all Beacon investors benefitted from their efforts. Def. Reply at 4 ("[*W]ith the exception of AIJED and the other investors like AIJED*, Beacon's investors have received higher distributions than they would otherwise have received . . . .") (emphasis added); *see also id.* at 1 n.2 (defining "Non-AIJED Beacon Investors").

While the Court recognizes that, in certain cases, fairness dictates attorneys be compensated for the extraordinary work they perform on behalf of a large group of litigants, this case is not one of them. Defendants cannot reasonably claim they incurred any risk of no recovery, as their participation began after the Madoff-related recoveries were secured. If anything, the risk to Defendants here was not receiving a greater portion of the Madoff-related assets—a risk that was uniquely theirs and cannot be fairly attributed to Beacon. Therefore, the cost should be Defendants' alone. *See In re Prudential Securities Inc. Ltd. Partnerships Litig.*, 911 F. Supp. 135, 141 (S.D.N.Y. 1996) ("[W]here legal work has been performed on behalf of claimants who have elected to exclude themselves from the class . . . it would be inappropriate to impose the cost of that work on the class.").

## C.  Defendants Fail to Substantiate Their Fee Application

Finally, even if Defendants' work contributed some material benefit to Beacon, the Court would be unable to grant their request for attorneys' fees because

they have not submitted contemporaneous billing records, which "are a prerequisite for attorney's fees in this Circuit." *N.Y.S. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147 (2d Cir. 1983); *see also McDonald ex rel. Prendergast v. Pension Plan of the NYSA–ILA Pension Trust Fund*, 450 F.3d 91, 96–97 (2d Cir. 2006) (to recover attorneys' fees, "the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials").  Although counsel for both Defendants each state in their respective declarations the total number of hours billed and the hourly rates for the attorneys involved and provide a summary of the tasks completed, neither declaration attaches detailed time records, what services each lawyer rendered, the qualification of each lawyer, or the basis for each lawyer's hourly wage.  Whiteley Decl. ¶¶ 17–19; Folkenflik Decl. ¶ 12.  Given the lack of evidentiary support that Defendants are each entitled to $700,000, or three to four times their unsubstantiated lodestars ($225,558 for Fastenberg and $175,000 for Income Plus, respectively), these cursory declarations fall short.  Defendants' failure to provide sufficient evidence of their attorneys' fees thus provides yet another justification to deny their motion.

### III.  CONCLUSION

For all the foregoing reasons, Defendants' motion for attorneys' fees and costs is denied.

**SO ORDERED.**

Date:  May 7, 2020
      New York, New York

JAMES L. COTT
United States Magistrate Judge